UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JACOB LEE ENTERPRISES, LLC,

Plaintiff,

Case No. 22-cv-654-pp

v.

ERIE INSURANCE EXCHANGE,

Defendant.

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(DKT. NO. 16) AND DISMISSING CASE**

On May 6, 2022, the plaintiff (a Wisconsin limited liability corporation) filed a complaint in Racine County Circuit Court alleging that the defendant (a Pennsylvania corporation) breached its insurance contract with the plaintiff by denying coverage for wind and water damage to the plaintiff's building in Racine, Wisconsin. Dkt. No. 1-2. On June 2, 2022, the defendant removed the case to federal court, asserting diversity jurisdiction, dkt. no. 1, and the defendant answered, dkt. no. 2. On June 30, 2023, the defendant filed a motion for summary judgment. Dkt. No. 16. The motion has been fully briefed since September 2023. The court will grant the defendant's motion for summary judgment and dismiss the case.

**I.    Background**

The following facts are undisputed unless otherwise noted.

A.    <u>The Parties</u>

The plaintiff is an LLC owned and managed by the Aukland family; the plaintiff primarily owns, rents and manages properties. Dkt. No. 24 at 1, ¶¶1–2.

1

These properties include a building at 946 Garfield Street in Racine, Wisconsin that is the subject of this case. Id. at 2, ¶3. On September 13, 2021, there was a storm in Racine that caused significant damage throughout the area, including numerous fallen trees due to high winds. Dkt. No. 33 at ¶¶9–10. Two days later, Krisjan Aukland noticed that a portion of the roof was flapping over the side of the building like a sail. Id. at ¶11. Krisjan's brother Tyler joined him at the building on September 15, and the Aukland brothers went up to the roof and noticed that the roof membrane had torn, leaving a large portion of the gypsum layer of the roof exposed. Id. at ¶12. Shortly thereafter, the plaintiff reported a claim to the defendant for the roof. Id. at ¶13.

B.     The Plaintiff's Claim

The defendant appointed John Thomsen as its claim adjuster for the plaintiff's claim. Dkt. No. 33 at ¶15. On September 17, 2021, Thomsen met the Aukland brothers at the building to inspect the damage. Id. at ¶18. Thomsen's inspection report noted that "[s]heathing is in good condition." Id. at ¶19. Thomsen also reported that at the time of his inspection, the building had not experienced any new water damage. Id. at ¶21. The parties dispute what Thomsen instructed the Auklands to do about the roof after his inspection. According to the plaintiff, Thomsen told the Auklands that they could not have the roof tarped or do anything else until a consultant had had an opportunity to review the damage. Id. at ¶20. The defendant contends that Thomsen advised the Auklands not to make repairs to the roof until a consultant

2

inspected it but also told the Auklands to perform mitigation (which would have included tarping the roof). Id.

The defendant retained Roofing Consultants, Ltd. (RCL) to inspect the roof. Id. at ¶24. Though the damage occurred on September 13, 2021, RCL did not complete the inspection until October 15, 2021. Id. at ¶25. On ten days in the meantime, there was precipitation in the Racine area, ranging from drizzling to downpours. Id. at ¶26. During these storms, more rainwater entered the building. Id. at ¶27.

The plaintiff was concerned that the delay in inspecting the roof was causing additional damage to the roof. Dkt. No. 33 at ¶28. On October 14, 2021, the plaintiff texted Thomsen asking when the inspection would occur. Id. at ¶29. Thomsen then called the plaintiff and advised it to tarp the roof. Id. at ¶30. The defendant disputes that this was the first time Thomsen advised the plaintiff to tarp the roof. Id.

C.    RCL's Inspection

RCL assigned Senior Consultant Nicholas Gorgen to the claim; Gorgen inspected the roof on October 15, 2021. Dkt. No. 24 at 3, ¶¶7–9. Gorgen made the following observations in his report:

> In general, the current roof is in poor condition. There are numerous failed/open seams and perimeter flashings, some have resulted in relatively large-scale breaches in the roof and exposure of the wood deck. A variety of repair attempts of multiple vintages were observed throughout the roof. Some of these are largescale repairs that intersect or overlap other large-scale repairs. The fluid-applied polymer coating over the roof includes polyester reinforcement in some locations but not in others. The age of the acrylic top coat varies as evidenced by the level of degradation. It also appears that

3

coatings have been used sporadically as a repair method at random locations.

Id. at 3-4, ¶10 (quoting Dkt. No. 19-3 at 3). Gorgen also made the following

comments in the report:

Significant wind-related displacement of the membrane is present in the west half of the roof, exposing the underlying gypsum coverboard and accounting for approximately 40% of the total square footage of the roof. The location and scale of this area is illustrated on the included roof plan. Unlike most wind-related failures, which typically begin at a membrane termination such as a roof edge, this failure appears to have started in the field of the roof. Examination of the displaced membrane shows no detachment at either a parapet wall or the gutter edge. This suggests that some type of attachment deficiency was present in the field of the wind-affected area. Examination of satellite imagery from April 2021 clearly shows a large-scale failure in the field of the west half of the roof. It is possible, if not probable, that this represents an earlier stage of the current state of the roof.

Significant degradation of the gypsum coverboard is readily discernible. Additionally, the related fasteners and plates are heavily corroded. This is evidence that these elements have been exposed to moisture for an extended period of time, suggesting that water infiltration has been occurring since long before the reported date-of-loss. Excessive and widespread water staining and damages to the structural wood elements throughout the interior of the facility on every floor level further support long-term water infiltration.

Id. at 4, ¶11 (quoting Dkt. No. 19-3 at 4). The report included the following

analysis of weather data:

The included Corelogic Wind Verification Report has a reporting threshold of 58 MPH or higher 3-second gust occurring at 10 meters above-ground-level (Note: The subject roof is 1-story higher than the recording height in the report, causing the possibility of incrementally higher wind speeds). The report lists numerous notable wind events occurring at the subject property in the previous decade, however, no event is listed for the reported date-of-loss. In the recorded period the highest wind speed is 65 MPH, occurring in August of 2020, which a properly installed and maintained commercial roof system should be able to withstand. This wind report is supporting evidence that the questionable

4

installation/repairs and long-term water infiltration in the field of the subject roof were factors in its failure. This is further supported by the absence of failure at the poorly terminated perimeter where wind forces are the greatest.

Id. at 4-5, ¶12 (quoting Dkt. No. 19-3 at 4). Finally, Gorgen made the following conclusions:

The large area of displaced membrane in the west half of the subject roof is resultant of one or more wind events. Although wind caused the final displacement of the membrane, it is our opinion that the root cause of the failure is a combination of questionable installation/repairs and long-term water infiltration. Furthermore, the displacement may have been progressive, likely beginning earlier than the reported date-of-loss. As discussed above, satellite imagery from April of this year appears to show an earlier stage of the current failure. This initial failure may have allowed displacement to begin, and subsequently grow exponentially as increasing amounts of membrane became detached from the substrate.

Id. at 5, ¶13 (quoting Dkt. No. 19-3 at 4). 31.

The plaintiff disputes Gorgen's conclusions and, based on its consulting expert's analysis, contends that his methodology is flawed. Dkt. No. 33 at ¶¶66–86. After RCL's inspection on October 15, 2021, the plaintiff had CRS Roofing perform temporary repairs and tarp the roof. Id. at ¶31.

On November 4, 2021, the defendant sent the plaintiff a reservation of rights letter. Dkt. No. 33 at ¶32. The reservation of rights letter does not mention the policy provisions that the defendant now cites as a basis for its motion for summary judgment and does not mention that the defendant was investigating the applicability of policy exclusions. Id. at ¶33. The plaintiff contends that the reservation of rights letter did not comply with the defendant's policies and procedures for reservation of rights letters. Id. at ¶34. Specifically, the plaintiff argues that the letter does not contain statements as

5

to why the claim may not be covered and does not reference policy terms, conditions or exclusions relating to coverage issues that cite the specific page number and section of the policy relevant to coverage. Id. The defendant disputes this, stating that it drafted the letter before receiving RCL's report and that consistent with its policies and procedures, the letter states that the defendant waives no rights and "specifically reserves the right to rely on any other policy terms, conditions or exclusions which may become applicable through further investigation." Id. (quoting Dkt. No. 25-10 at 2).

After receiving RCL's report, the defendant retained counsel related to the claim. Dkt. No. 24 at 5, ¶14. Keye Voigt of Fortitude Public Adjusters—the plaintiff's public adjuster—specifically requested a copy of the RCL report from Thomsen but was told by Thomsen that "[t]he roof report is considered work product and will not be released at this time." Dkt. No. 33 at ¶37. On November 8, 2021, the plaintiff's counsel requested the roof report from Thomsen. Id. at ¶39. The defendant did not provide the plaintiff with a copy of the RCL report until its July 26, 2022 Rule 26(a)(1) disclosures in this case. Id. at ¶40.

D.    The Plaintiff's Repairs

On November 11, 2021, the defendant authorized a $4,350 payment for CRS Roofing's temporary repairs and tarping. Dkt. No. 33 at ¶35. The plaintiff then solicited additional roofing bids and provided those bids to the defendant. Id. at ¶36. Complete Roofing and Exteriors provided the following description of its emergency services in an invoice for its services:

> Emergency services overtime hours to cover roof layers missing and other penetrations' due to extreme wind damage to the roofing layer.

6

> In order to ensure the property was water tight we covered with a non permeable tarp and temporarily sealed all edges with termination bar and flashing tape. In addition to plates and screws. On the penetrations we covered cleaned the area covered the hole and sealed it with a patch and flashed around.

Dkt. No. 24 at 13, ¶40 (quoting Dkt. No. 19-11). Silver Lining Property Restoration also completed an estimate for repairs to the building; that estimate does not include any discussion or narrative about the cause of damage to the roof. Id. at ¶42. Silver Lining employee Brian Hintze testified in his deposition that he was operating under the assumption that the roof was damaged by wind, but that he had not inspected the roof. Id. at ¶43.

On November 9, 2021, the plaintiff's counsel sent another letter to Thomsen, stating that the plaintiff had "hired Complete Roofing & Exteriors to repair the roof this week in accordance with the attached estimate. *Please let me know before 4:30 p.m. tomorrow if Erie wishes to further inspect the existing roof or any of its components before the repair work begins.*" Dkt. No. 33 at ¶41 (emphasis in original). The letter contained a copy of CRS Roofing's quote for the roof replacement and stated: "If you decline to pay the full amount claimed in this written notice and proof of loss, please set forth in writing each basis, including any supporting documentation, you have for tendering only the amount you have chosen to tender." Id. at ¶42. The defendant did not respond to the letter, so the plaintiff directed CRS to replace the roof, which it did toward the end of November 2021. Id. at ¶43.

E.    Pre-Litigation Conduct

On December 13, 2021, Thomsen sent a letter to the plaintiff advising that the defendant accepted coverage for the roof. Dkt. No. 33 at ¶45. The defendant's calculation determined that, due to the condition of the roof at the time of the loss, a 50% depreciation would be applied, so Thomsen authorized a payment of $16,766.15 for the damage. Id. at ¶46. The plaintiff never received that payment. Id. at ¶47. But the defendant states that as of December 21, 2021, it still was investigating and evaluating coverage for the roof based on the RCL report and considering whether any policy exclusions applied. Id. at ¶50.

On January 3, 2022, the plaintiff provided its proof of loss to the defendant. Dkt. No. 33 at ¶52. On January 12, 2022, Thomsen rejected the plaintiff's proof of loss because he still was investigating, and he disagreed with the repair number. Id. at ¶54. The defendant did not obtain its own cost of repair estimates until April 14, 2023—nearly a year after the plaintiff filed this lawsuit. Id. at ¶55.

On March 29, 2022, the plaintiff's counsel wrote to follow up on the claim, stating that the promised payment was overdue and that if payment was not made in ten days, the plaintiff would pursue legal remedies. Id. at ¶57. On March 30, 2022, the defendant's counsel responded that it would provide a claim status update "very soon." Id. at ¶58. There were no further communications from the defendant for over a month, so on May 6, 2022, the plaintiff filed this case. Id. at ¶¶59–60.

8

F.    Expert Witnesses

In addition to Gorgen, the defendant retained several experts to evaluate various aspects of the plaintiff's claim. Dkt. No. 24 at 6, ¶17. Dr. Payam Fallah, Ph.D., a microbiologist, analyzed fungal growth, which the defendant asserts was intended to distinguish between fast-growing surface fungi (which would indicate recent water intrusion) and slow-growing wood rot (which would indicate long-term water intrusion). Id. at ¶19. The defendant asserts that Dr. Fallah's analysis found fast-growing fungi in the immediate vicinity of the roof leak but that elsewhere in the building, only slow growth wood rot existed. Id. at 7, ¶20. The defendant asserts that this shows that the water infiltration on September 13, 2021 was limited to the immediate area around the fourth floor. Id. The plaintiff disputes this, arguing that the Auklands saw water pouring down throughout the building after the storm. Id.

The defendant retained Neal Hanke, P.E., a metallurgist, to analyze metal surfaces in the building to determine whether rust on exposed metals indicated whether water intrusion in the building was new or old. Id. at ¶21. Hanke concluded that exposed metals showed signs of corrosion consistent with moisture exposure over a long period of time. Id. at ¶22. Hanke concluded that the building did not experience a substantial increase in moisture intrusion because of the September 13, 2021 wind event. Id. at 8, ¶25.

Matthew Peterson and Dan Doubrava, both of Envista Forensics, inspected the building to determine the scope of water damage arising out of the September 13, 2021 storm event and the cost to make necessary repairs.

9

Id. at ¶26. Envista concluded that repairs related to the storm would cost $140,849.18. Id. at ¶27.

The plaintiff did not retain any experts for litigation, stating that it does not have expert reports beyond the contractor estimates describing the work contractors would perform (or had performed) on the roof and the costs for doing so. Id. at 9, ¶¶28–30. The plaintiff argues that it could not retain experts to evaluate the factual basis for RCL's conclusions due to the defendant's refusal to disclose the RCL report before the roof was replaced and the defendant's failure to identify any policy exclusions it was considering applying to the loss with respect to the roof. Dkt. No. 33 at ¶63.

G.     The Insurance Policy

The plaintiff's insurance policy states that it "insures against direct physical 'loss,' except 'loss' as excluded or limited in this policy." Dkt. No. 24 at 10, ¶36 (quoting Dkt. No. 2-1 at 28). The policy defines "loss" as "direct and accidental loss of or damage to covered property." Id. at ¶37 (quoting Dkt. No. 2-1 at 58.) The policy contains the following exclusions:

> SECTION III – EXCLUSIONS
>
> A.     Coverages 1, 2, 3, 4, and 5
>
> We do not cover under Building(s) - Coverage 1; Business Personal Property and Personal Property of Others – Coverage 2; Additional Income Protection - Coverage 3; Glass and Lettering - Coverage 4; and Signs, Lights, and Clocks – Coverage 5 "loss" or damage caused directly or indirectly by any of the following. Such "loss" or damage is excluded regardless of any cause or event that contributes concurrently or in any sequence to the "loss":

10

\* \* \*

3. "Loss" or damage caused by or resulting from any of the following:

a. By weather conditions, but only if weather conditions contribute in any way with a peril excluded in Part A. of Section III - Exclusions to produce the "loss";

\* \* \*

c. By faulty, inadequate, or defective:

***

2) Design, specifications, workmanship, repair, construction, renovating, remodeling, grading, or compaction;

3) Materials used in repair, construction, renovation, or remodeling; or

4) Maintenance;

of property whether on or off the insured premises by anyone, but if "loss" by a peril insured against results, we will pay for the ensuing "loss".

***

B. Coverages 1, 2, and 3

We do not cover under Building(s) - Coverage 1, Business Personal Property and Personal Property of Others – Coverage 2, and Additional Income Protection - Coverage 3 "loss" or damage caused:

1. By:

a. Wear and tear, rust, or corrosion

unless a covered "loss" including "accident" or "electronic circuitry impairment" ensues, and then only for ensuing "loss".

***

11

> 11. To the interior of the building or the contents by rain, snow, sand, or dust, whether driven by wind or not, unless the exterior of the building first sustains damage to its roof or walls by a peril insured against. We will pay for "loss" caused by or resulting from the thawing of snow, sleet, or ice on the building.

Id. at 11-12, ¶¶38–39 (quoting Dkt. No. 2-1 at 28–31).

### H.    Relevant Procedural History

On June 30, 2023, the defendant filed a motion for summary judgment. Dkt. No. 16. In support, the defendant submitted the report that Gorgen prepared after his inspection of the building's roof. Dkt. No. 19-3. The plaintiff filed a motion to exclude Gorgen's report and testimony, or in the alternative, to allow the plaintiff to name a rebuttal witness. Dkt. No. 30. The plaintiff asserted that the defendant had withheld the report until after litigation began; as a result, the plaintiff was not able to prepare a rebuttal report because the roof had been repaired before litigation began. Id. at 9–10. The court denied that motion. Dkt. No. 46.

## II.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

12

A moving party "is 'entitled to a judgment as a matter of law'" when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Still,

> a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Id. (internal quotation marks omitted).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. See Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003) (citing Liberty Lobby, 477 U.S. at 255). "However, [the court's] favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." Fitzgerald v. Santoro, 707 F.3d 725, 730 (7th Cir. 2013) (quoting Harper v. C.R. Eng., Inc., 687 F.3d 297, 306 (7th Cir. 2012)). That is, "to survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in her favor." Fitzgerald, 707 F.3d at 730 (quoting Makowski v. SmithAmundsen LLC, 662 F.3d 818, 822 (7th Cir. 2011)).

## III.    Motion for Summary Judgment (Dkt. No. 16)

The defendant seeks summary judgment on the plaintiff's breach of contract claim, arguing that the roof damage is not covered under the terms of

13

the parties' insurance contract. Dkt. No. 17 at 1. Alternatively, the defendant moves for partial summary judgment on the plaintiff's bad faith claim, arguing that its denial of coverage was objectively reasonable. Id.

A.  Breach of Contract

1.  *Parties' Arguments*

The defendant argues that under Wisconsin law, the court should assess the breach of contract claim using a three-part framework. Id. at 6. It says the court first should consider whether the policy initially covers the claim, then whether any exclusions apply to preclude coverage, then whether there are any exceptions to that exclusion that would reinstate coverage. Id. at 6–7 (quoting American Family Mut. Ins. Co. v. American Girl, Inc., 268 Wis. 2d 16, 32–33 (Wis. 2004)). The defendant does not dispute that the parties' policy covers roof and interior water damage, but it argues that there are four exclusions precluding coverage of this claim. Id. at 7.

The defendant argues that the policy excludes interior water damage that does not result from covered damage to the building's exterior. Id. at 7–8. The defendant asserts that means the interior water damage to the building is covered only if it was caused by the roof damage. Id. at 8.

Turning to the roof, the defendant argues that, based on Gorgen's inspection and report, three things caused the damage to that area: high winds, long-term water infiltration and prior attempted repairs. Id. at 10–11. The defendant asserts that if another exclusion also applies to the loss, the wind damage triggers the weather exclusion in the policy. Id. at 10. It contends

14

that high winds could not have been the only cause of the damage because the weather reports for September 13, 2021 did not exceed the rated capacity for a properly installed roof of this kind and that the damage was in the middle of the roof rather than at the edge. Id. The defendant asserts that the interior water damage Gorgen discovered showed that the roof had been leaking water for a substantial amount of time prior to the storm, which would trigger the wear and tear exclusion. Id. According to the defendant, the prior attempted repairs were "not performed to industry standards," which contributed to the water infiltration. Id. at 11. The defendant argues that this shows a combination of "faulty, inadequate, or defective . . . workmanship, repair, construction, renovating, remodeling, . . . materials . . . [or] maintenance," triggering the defective work exclusion. Id. (quoting Arnold v. Cincinnati Ins. Co., 276 Wis. 2d 762, 776–77 (Wis. Ct. App. 2004)). It maintains that the weather exclusion and the wear and tear exclusion each trigger the anti-concurrent causation provision in the policy, which states that if even one of those exclusions apply, the policy provides no coverage. Id.

The defendant next argues that no exceptions to the exclusions apply to reinstate coverage. Id. It contends that the wear and tear and defective workmanship exclusions are both subject to an ensuing loss exception, which applies where the loss is caused not by the "excluded peril" but follows as a "chance, likely, or necessary consequence" of the excluded peril. Id. at 11–12 (quoting Arnold, 276 Wis. 2d at 779). The defendant argues that here, even though rainwater entering the building is an ensuing loss caused by the storm

15

damage, the policy's weather exclusion combines with the workmanship exclusion and interior damage limitation to exclude the rainwater. Id. at 13. The defendant asserts that because the ensuing loss exception does not restore coverage, none of the damage to the building is covered by the parties' policy. Id.

The plaintiff responds that the defendant cannot establish the alleged exceptions because the defendant relies solely on Gorgen's expert report, which is flawed. Dkt. No. 23 at 13. It argues that summary judgment generally should not be granted based on expert testimony because a jury is free to reject an expert's opinion as not credible. Id. It asserts that Gorgen's conclusions are based on faulty methodology and unreliable data, contending that a jury would not find Gorgen's opinions reliable or credible. Id. at 14.

The plaintiff argues that Gorgen's conclusions are not reliable because they are based on hypotheticals. Id. It says that Gorgen stated that the roof damage "may have been progressive," which indicates uncertainty. Id. It asserts that Gorgen relied in part on an April 2021 Google Earth aerial image of the roof showing damage prior to the storm, but that Gorgen could not identify the actual date the photo was taken. Id. at 14–15. The plaintiff argues that even accepting Gorgen's conclusions, it performed maintenance on the roof in July 2020 and found no tears, so any damage present in the April 2021 photo would have had to occur between those dates. Id. at 15. The plaintiff contends that roofs don't tear without some outside force, so the damage still should be covered under its prior policy period. Id.

The plaintiff argues that Gorgen was not qualified to assess whether the wind speed during the storm was high enough to cause the roof damage. Id. at 16. It contends that the defendant's own notes indicate that there were wind gusts of up to 50 miles per hour on September 13, 2021, which is high enough to trigger a "high wind warning." Id. It asserts that Gorgen did not calculate what the wind speed would have been at the roof's level and relied solely on third-party calculations. Id. at 16–17. The plaintiff argues that any weakening of the roof was due to age and that Gorgen did not consider what role age played in the damage. Id. at 17.

The plaintiff argues that there are fact issues precluding the application of the defective workmanship exclusion. Id. at 18. It asserts that the exclusion applies only if the workmanship was both defective and a cause of the loss. Id. According to the plaintiff, the defendant doesn't sufficiently identify what the defect is, nor what repair allegedly failed and caused the damage. Id. at 18–19. The plaintiff argues that Gorgen did not establish a baseline of industry standards in his report, so there is no basis to find that the roof's repairs were defective and caused the loss. Id. at 19.

The plaintiff argues that the wear and tear exclusion is inapplicable based on the facts. Id. at 20. It maintains that Gorgen had no reliable basis to conclude that long-term water infiltration caused the roof to degrade because Gorgen was unable to inspect the roof until a month after the storm, during which time additional rainfall could have damaged the roof further. Id. The plaintiff says that during the initial inspection, the defendant's adjuster noted

17

that the sheathing was in "good condition," which is at odds with Gorgen's later report. Id. at 20–21. The plaintiff also argues that the policy's wear and tear exclusion applies only if the loss was caused *solely* by wear and tear, which the defendant does not argue. Id. at 21–22. The plaintiff asserts that the delay in inspecting the roof is what caused the additional water damage and that the water damage was not an ensuing loss from the storm damage. Id. at 23–24. (In a footnote, the plaintiff asks that if the court finds differently, the court grant it leave to amend its pleadings to add a separate negligence claim against the defendant for the way it conducted the claim investigation. Id. at 24 n.12.) The plaintiff argues that it followed the defendant's instructions and did not tarp the roof, which allowed the subsequent rain to damage the roof further. Id. at 25–26.

The defendant replies that in moving for summary judgment, it is entitled to rely on Gorgen's report and that the plaintiff is not entitled to introduce an undisclosed "consulting expert" to rebut Gorgen's conclusions. Dkt. No. 32 at 2–5. The defendant says that the Aukland brothers' lay opinion as to the status of the roof before the storm also is insufficient to rebut Gorgen's report because the Auklands were not disclosed as experts. Id. at 5–6. The defendant maintains that there is no admissible evidence supporting the plaintiff's argument that the loss began as early as July 2020. Id. at 7–8. Finally, the defendant contends that it instructed the plaintiff to take mitigating measures—including tarping the roof—until RCL could inspect the roof. Id. at

18

8. The defendant argues that the plaintiff's failure to do so is another instance of defective work and the subsequent interior damage is still not covered.

### 2. *Analysis*

The court already has denied the plaintiff's motion to exclude Gorgen's expert report and has declined to give the plaintiff leave to designate a rebuttal expert. Dkt. No. 46. At summary judgment, the court will not reconsider the admissibility of Gorgen's report. Nor will the court consider the "consulting expert" report on which the plaintiff relies in its opposition brief. In its prior order, the court did not grant the plaintiff leave to designate any experts because the time to do so had long passed and the plaintiff had not established that its failure to timely do so was substantially justified or harmless. Id. at 9–10. The plaintiff cannot skirt that ruling by now relying on a report from an undisclosed consulting expert in its opposition to summary judgment. See Morningware, Inc. v. Hearthware Home Prods., Inc., Case No. 09 C 4348, 2012 WL 3721350, at *6–7 (N.D. Ill. Aug. 27, 2012) (granting motion to strike consulting expert's affidavit submitted in opposition to summary judgment motion because consultant was not properly disclosed as a testifying expert). Absent the consulting expert report, the plaintiff has presented no evidence to rebut Gorgen's conclusions, and the court has no reason to find Gorgen's report unreliable or otherwise inadmissible.

Under Wisconsin law, insurance policy contracts are interpreted using a three-step framework:

First, we examine the facts of the insured's claim to determine whether the policy's insuring agreement makes an initial grant of

19

coverage. If it is clear that the policy was not intended to cover the claim asserted, the analysis ends there. If the claim triggers the initial grant of coverage in the insuring agreement, we next examine the various exclusions to see whether any of them preclude coverage of the present claim. Exclusions are narrowly or strictly construed against the insurer if their effect is uncertain. We analyze each exclusion separately; the inapplicability of one exclusion will not reinstate coverage where another exclusion has precluded it. Exclusions sometimes have exceptions; if a particular exclusion applies, we then look to see whether any exception to that exclusion reinstates coverage. An exception pertains only to the exclusion clause within which it appears; the applicability of an exception will not create coverage if the insuring agreement precludes it or if a separate exclusion applies.

Am. Fam. Mut. Ins., 268 Wis. 2d at 32–33 (internal citations omitted). The

defendant does not dispute that there is an initial grant of coverage, so the

issue is whether there are any applicable exclusions and if so, whether an

exception to any exclusions applies. The defendant relies on four exclusions to

preclude coverage for the plaintiff's claim: the interior damage exclusion, the

weather exclusion, the defective work exclusion and the wear and tear

exclusion. The court will address each of these, starting with the exclusions

potentially applicable to the roof damage.

The defendant invokes the weather exclusion, which states that loss or

damage resulting from "weather conditions" is excluded from coverage "only if

weather conditions contribute in any way with a peril" otherwise excluded by

the policy. Dkt. No. 2-1 at 28 ¶(III)(A)(3)(a). The defendant argues that the high

winds contributed to the roof damage but were not the sole cause. The

defendant supports this argument with Gorgen's report, which states that the

placement of the roof damage (in the middle of the roof instead of at the edges)

indicates there was pre-existing damage to the roof. Dkt. No. 19-3 at 4. The

plaintiff attacks Gorgen's conclusions, asserting that he didn't take the age of the roof into account and that the high wind speeds on September 13, 2021 were enough to cause the damage to the roof. But the plaintiff presents no expert testimony or any other admissible evidence supporting this alternative conclusion. Judge Adelman addressed a similar issue in Prosperity Hands, LLC v. State Farm Fire & Cas. Co., Case No. 15-C-0483, 2017 WL 435786 (E.D. Wis. Feb. 1, 2017). There, the plaintiff opposed the defendant insurer's motion for summary judgment, arguing that a storm had caused the damage to the building. Id. at *4. Because the plaintiff did not support this argument with admissible expert witness testimony, Judge Adelman held that a reasonable jury could not find that the storm caused the damage because it was "outside the knowledge of a lay juror to determine whether the storm . . . was capable of causing this damage." Id. at *5 (citing Menick v. City of Menasha, 200 Wis. 2d 737, 748 (Wis. Ct. App. 1995)).

Similarly, the plaintiff here lacks expert testimony to support its argument that the high winds on September 13, 2021 were the sole cause of the roof damage. The plaintiff attacks Gorgen's data on the wind speed on September 13 and relies on the notes of the defendant's adjuster, which state only that there was a single wind gust of 52 miles per hour on September 13. Dkt. No. 25-2 at 2. The wind data on which Gorgen's report relies has a reporting threshold of 58 miles per hour, so it is not inconsistent with the adjuster's notes. Dkt. No. 19-3 at 4. The plaintiff has presented no admissible evidence that a wind gust of 52 miles per hour (as opposed to 58 or more) is

21

sufficient to cause the damage the roof suffered. The lack of evidence supporting the plaintiff's argument is fatal to its claim. The defendant has established that high winds were not the sole cause of the roof damage, so the policy's weather exclusion applies if the roof damage was caused in part by another policy exclusion.

The defendant asserts that wear and tear on the roof contributed to the damage. The policy states that it does not cover damage caused by "(w)ear and tear, rust, or corrosion." Dkt. No. 2-1 at 30 ¶(III)(B)(1)(a). Gorgen's report states that "[s]ignificant degradation of the gypsum coverboard" was visible during his inspection and that the "related fasteners and plates [were] heavily corroded." Dkt. No. 19-3 at 4. Gorgen concluded that those elements, combined with "excessive and widespread water staining and damages to the structural wood elements throughout the interior" of the building, indicated long-term water damage predating the September 13 storm. Id. The defendant's other experts also found evidence of long-term water infiltration throughout the building. Dkt. No. 24 at ¶¶19–25. The plaintiff disputes these conclusions with lay testimony from the Aukland brothers that the roof was in good condition as recently as July 2020, and that water was "physically seen pooling" in the building after the storm. Id. at ¶¶20, 25; Dkt. No. 33 at ¶6. That is not sufficient to create a genuine issue of material fact as to whether there was preexisting damage to the roof that occurred *between* July 2020 and September 2021 and contributed to the loss after the September 2021 storm. Again, the plaintiff's failure to present any evidence on this issue is fatal. Absent such rebuttal

evidence, there is no genuine issue of material fact as to whether pre-existing wear and tear on the building (combined with the weather event) contributed to the loss.

The defendant asserts that defective work contributed to the roof damage, invoking the policy's defective work exclusion. The policy states that it does not cover loss or damage caused "[b]y faulty, inadequate, or defective . . . 2) [d]esign, specifications, workmanship, repair, construction, renovating, remodeling, grading, or compaction; 3) [m]aterials used in repair, construction, renovation, or remodeling; or 4) [m]aintenance." Dkt. No. 2-1 at 28 ¶(III)(A)(3)(c). Gorgen's report recounts that there were several "repair attempts" on the roof, some of which were "large-scale repairs that intersect or overlap other large-scale repairs." Dkt. No. 19-3 at 3. Gorgen opined that "questionable installation/repairs" contributed to the roof damage. Id. at 4. The plaintiff argues that the defendant has failed to establish what repairs were defective.

The plaintiff does not cite any authority to support its argument, and Wisconsin case law does not support the plaintiff's position. In Arnold, 276 Wis. 2d at 775–76, the Wisconsin Court of Appeals interpreted a similar "faulty workmanship" exclusion in the parties' insurance policy. There, the defendant's expert opined that several faulty repairs combined to cause the damage to the subject property. Id. at 772. The court held that the faulty workmanship exclusion applied, stating that "the use of the word 'repair' would be understood by a reasonable insured to refer to all repairs, regardless of the size." Id. at 775. Applying that reasoning, this court determines that the

23

defendant need not identify a particular repair that caused the damage because a fair reading of the policy excludes *all* faulty repairs. And because the plaintiff has not provided any expert testimony to rebut Gorgen's conclusions, the court cannot find that there is a genuine issue of material fact as to whether the defective work exclusion applies in this case.

Part of the plaintiff's claim is for damage to the interior of the building by rainwater. The defendant contends that the policy's interior damage exclusion prohibits recovery for this damage. That provision of the policy states that loss or damage "[t]o the interior of the building or the contents by rain" is excluded from coverage "unless the exterior of the building first sustains damage to its roof or walls by a peril insured against." Dkt. No. 2-1 at 31 ¶(III)(B)(11). The court interprets this provision to mean that the policy covers interior rainwater damage only if the roof damage itself is covered. See Prosperity Hands, 2017 WL 435786, at *3 (interpreting substantially similar policy provision). The plaintiff does not dispute this interpretation; it contends that the interior damage was caused by the defendant's month-long delay in inspecting the roof. But the plaintiff presents no evidence supporting this conclusion other than its own unsupported assertion. Even assuming that the interior damage was caused solely by rain that leaked through the damaged roof after the September 13 storm, the plaintiff cites no provision in the insurance policy that would support coverage for such damage.[1] Because the court has determined

---

[1] Perhaps anticipating this issue, the plaintiff mentions in its brief that it wants to bring a negligence claim against the defendant for "the damage caused by the way in which [the defendant] conducted its claims investigation." Dkt. No.

24

that the roof damage is subject to an exclusion from the policy, the interior damage also must be excluded from the policy.

The defendant states that both the wear and tear and defective workmanship exclusions are subject to an "ensuing loss" exception. Under Wisconsin law, an ensuing loss provision means that coverage may be restored if the damage was a "chance, likely, or necessary consequence" of the excluded damage. Arnold, 276 Wis. 2d 762, 779. Further, "an ensuing loss must result from a cause *in addition to* the excluded cause." Id. (emphasis added). The Arnold court provided the following framework for evaluating ensuing losses:

> (1) we first identify the loss caused by the [applicable] exclusions and exclude that loss; (2) we next identify each ensuing loss, if any—that is, each loss that follows as a chance, likely, or necessary consequence from that excluded loss; and (3) for each ensuing loss we determine whether that is an excepted or excluded loss under the policy.

Id. at 783. The court has determined that defective workmanship and wear and tear caused the damage to the roof. The interior water damage is the loss that might follow as a chance, likely or necessary consequence from the defective workmanship or wear and tear.

The plaintiff claims that the interior water damage was not a consequence of the wind, defective workmanship or wear and tear, but was caused solely by the defendant's delay in inspecting the roof. Under the Arnold framework, the plaintiff's argument supports the conclusion that the interior

---

23 at 24 n.12. A footnote in a brief opposing summary judgment is not the proper way to request leave to amend the complaint, so the court has not considered this request.

water damage would *not* be covered by the ensuing loss provision. Even if the interior water damage was a consequence of the defective workmanship or the wear and tear on the roof, it would be subject to the interior damage exclusion. Based on the third prong of the <u>Arnold</u> framework, if the ensuing loss is separately excluded from coverage under the policy, the ensuing loss provision does not restore coverage. That is the case here. The ensuing loss exception does not apply to the damage.

The court will grant summary judgment for the defendant on the breach of contract claim because the damage to the plaintiff's building was not covered by the parties' insurance policy.

B.     <u>Bad Faith</u>

The defendant also seeks summary judgment on the plaintiff's bad faith claim, arguing that it did not breach the parties' contract or, alternatively, that its denial of coverage was objectively reasonable. Dkt. No. 17 at 14. It argues that an insurer cannot be liable for bad faith if there is no underlying breach of contract, so if the court dismisses the contract claim, it necessarily must dismiss the bad faith claim. <u>Id.</u> The plaintiff does not dispute this, arguing only that the defendant acted in bad faith in investigating and denying the claim. <u>See</u> Dkt. No. 23 at 26–30.

An underlying breach of contract "is a fundamental prerequisite for a first-party bad faith claim against the insurer by the insured." <u>Brethorst v. Allstate Prop. & Cas. Ins. Co.</u>, 334 Wis. 2d 23, 52 (Wis. 2011); <u>see also</u> <u>Wickman v. State Farm Fire & Cas. Co.</u>, 616 F. Supp. 2d 909, 924 (E.D. Wis.

26

2009) (granting summary judgment for the defendant insurer on bad faith claim where there was no underlying breach of contract). Because the court is granting summary judgment for the defendant on the breach of contract claim, the court also must grant summary judgment for the defendant on the bad faith claim.

## IV.     Conclusion

The court **GRANTS** the defendant's motion for summary judgment. Dkt. No. 16.

The court **ORDERS** that this case is **DISMISSED WITH PREJUDICE**. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 31st day of August, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

27